# EXHIBIT 3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CITY OF ST. PETERSBURG, FLORIDA,

Plaintiff,

v.

**Case No. 8:10-cv-693-T-26TBM**

WELLS FARGO BANK, N.A.,

Defendant.

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EXPERT OPINIONS OF R. GLENN HUBBARD AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rules 104(a), 401, 403, and 702 of the Federal Rules of Evidence, Plaintiff, the City of St. Petersburg, Florida ("St. Petersburg"), moves the Court, *in limine*, for an order precluding R. Glenn Hubbard from expressing any expert opinions at trial. As shown below, Dr. Hubbard's opinions are irrelevant to the issues in this case, are not based on sufficient facts or data, and are duplicative of other, more competent, expert testimony. As a result, Dr. Hubbard should be precluded from testifying at trial. In further support of this motion, St. Petersburg submits the following incorporated memorandum of law in accordance with Local Rule 3.1(a).

## PERTINENT FACTS

This case arises from the failures of Wachovia Bank, N.A. ("Wachovia")[1] to fulfill its contractual and fiduciary duties to St. Petersburg as the City's securities lending agent and investment adviser. In particular, Wachovia acted as St. Petersburg's securities lending agent between 2001 and 2008 pursuant to a Securities Lending Agency Agreement (the "Agreement"), a copy of which is attached as Exhibit A. As St. Petersburg's securities lending agent, Wachovia

---

[1] Wachovia was subsequently acquired by Wells Fargo Bank, N.A., in 2009, after the conduct at issue in this case occurred. (Joint Pretrial Statement, Stip. 4.)

was authorized to lend securities owned by St. Petersburg to third parties, and to receive cash collateral from the third parties in exchange for the loans. Wachovia was further authorized by St. Petersburg to invest the cash collateral in certain low-risk, fixed-income investments. Pursuant to the Securities Lending Investment Guidelines (the "Investment Guidelines") contained in Attachment B to the Agreement, the primary objective of these investments was supposed to be "safety of principal."

On March 20, 2007, Wachovia invested $15 million of St. Petersburg's cash collateral in notes issued by Lehman Brothers with a final maturity of March 23, 2009 (the "Lehman Investment"). After purchasing the Lehman Investment, Wachovia became aware of increasing risks associated with Lehman Brothers and, in turn, increasing risks associated with holding the Lehman Investment in St. Petersburg's account.

At trial, St. Petersburg will present evidence showing that by late 2007, and throughout the financial crisis of 2008, Wachovia had actual knowledge of significant risks associated with Lehman Brothers and the Lehman Investment. Indeed, by August, 2007, Wachovia recognized problems in the financial markets and instructed its securities lending to "exit" certain "names," including Lehman Brothers. (O'Connor Dep. at 145-57, Exs. 183, 184; Murphy Dep. at 105-113; Ex. 243.) Despite this express instruction, Wachovia's securities lending department decided to continue holding all term investments in Lehman Brothers, including the Lehman Investment purchased on behalf of St. Petersburg. One of the reasons for this decision was that "[t]o completely 'exit' all of [its] relationships with Bear Stearns, Lehman, and Greenwich Capital Markets would nearly destroy the current business of [Wachovia's securities lending department]. (O'Connor Dep. at 145-57, Ex. 184.) Instead, Wachovia elected only to restrict future purchases of Lehman Brothers investments, rather than following the directive that it was

given to "exit" all Lehman Brothers exposure. Moreover, St. Petersburg will present further evidence at trial that Wachovia considered the risks associated with investments in Lehman Brothers to be so significant that it took specific steps to divest itself of any investments in Lehman Brothers in which it (as opposed to its clients) bore the risk of loss.

With respect to St. Petersburg, however, Wachovia took no action to liquidate its Lehman Investment or to otherwise advise it of the increasing risks associated with holding it. Indeed, St. Petersburg will present evidence at trial that Wachovia failed to disclose any of its concerns with respect to the Lehman Investment to St. Petersburg. Moreover, in June and July 2008, Lehman was downgraded on three separate occasions by each of the three national credit rating agencies. (Joint Pretrial Statement, Stips. 6-8.) The evidence presented at trial will show that none of these downgrades were reported to St. Petersburg, despite the fact that Wachovia was contractually obligated to promptly notify St. Petersburg of all credit rating downgrades so that it could evaluate whether to sell the downgraded investment. (*See* Agreement, Attachment B at 1.)

Ultimately, on September 15, 2008, Lehman Brothers declared bankruptcy and defaulted on the Lehman Investment. As a result, St. Petersburg lost more than $11,000,000.

In defending this action, Wachovia has retained R. Glenn Hubbard ("Dr. Hubbard") to offer expert testimony on how the financial markets viewed Lehman Brothers in the summer of 2008. A copy of Dr. Hubbard's Expert Report and a copy of the excerpted pages from his deposition that are cited in this motion are attached hereto as Exhibits B and C, respectively.

In short, the gravamen of Dr. Hubbard's opinion is that in the summer of 2008, "the market" did not "reasonably foresee" that Lehman Brothers would declare bankruptcy. This conclusion is based on Dr. Hubbard's review of various market indicators (such as prices,

ratings, and credit default swaps) which, in his opinion, reflect that the "market" did not foresee a Lehman Brothers bankruptcy.

Importantly, though, Dr. Hubbard does not, and indeed cannot, offer any opinion as to what *Wachovia* foresaw with respect to Lehman Brothers or the Lehman Investment. (Hubbard Dep. at 56-60; 63-64.) Dr. Hubbard has not reviewed or evaluated any of Wachovia's internal documents in this case, nor has he reviewed any of the deposition testimony in this case. (Hubbard Dep. at 56, 59; 190-92.) As a result, Dr. Hubbard's academic exercise of trying to discern what "the market" foresaw in 2008 is detached from the actual issue in this case – whether *Wachovia* fulfilled its contractual and fiduciary obligations to St. Petersburg based on what *Wachovia* knew about the risks of the Lehman Investment and based on what *Wachovia* knew about St. Petersburg's risk tolerances.

Moreover, Dr. Hubbard's ultimate opinion – that the Lehman Brothers bankruptcy was not "reasonably foreseeable" – is misleading, imprecise, and irrelevant. Dr. Hubbard cannot define the term "reasonably foreseeable" in any meaningful way. According to Dr. Hubbard, an event such as the Lehman bankruptcy is "reasonably foreseeable" if there is a "material probability" that it will occur. (Hubbard Dep. at 73.) Dr. Hubbard concedes, as he must, that in the summer of 2008 there was a "probability" that Lehman Brothers would declare bankruptcy; but he is unable to quantify this probability. (Hubbard Dep. at 73-74.) In addition, he is unable to provide any guidance on what would make such a probability "material." (Hubbard Dep. at 73-74.)

Indeed, Dr. Hubbard concedes that whether the probability of the Lehman bankruptcy was "material" would depend upon the risk tolerance of the particular investor. (Hubbard Dep. at 73-81.) Whereas some investors may tolerate a certain amount of risk, others will not. Dr.

4

Hubbard, however, has never looked at St. Petersburg's risk tolerances or the Investment Guidelines that governed its securities lending account. (Hubbard Dep. at 55-56, 58-59, 148.) Accordingly, Dr. Hubbard had to concede that he has no opinion as to whether the probability of the Lehman default would have been "material" to St. Petersburg. (*See* Hubbard Dep. at 148.)

In the end, Dr. Hubbard's opinions are simply not helpful to the trier of fact and run the risk of confusing the jury. Dr. Hubbard's opinions do not address *Wachovia's* assessment of the Lehman Investment, the propriety of *Wachovia's* decision to hold the Lehman Investment in St. Petersburg's account, or *Wachovia's* failure to disclose any of the risks it had identified with respect to the Lehman Investment. Moreover, Dr. Hubbard's opinion that the Lehman bankruptcy was not "reasonably foreseeable" is vague, imprecise, and confusing in that he is unable to offer any meaningful opinion as to the probability of default or whether such a probability would have been "material" to St. Petersburg.

Finally, to the extent any of Dr. Hubbard's testimony would be admissible, such testimony would be duplicative of Wachovia's other expert in this matter – Edmon W. Blount ("Mr. Blount"). In his expert report, Mr. Blount opines as to why, in his opinion, it was reasonable for Wachovia to continue to hold the Lehman Investment in St. Petersburg's account through the summer of 2008. Like Dr. Hubbard, Mr. Blount bases his opinion on ratings and other information available to the market. Unlike Dr. Hubbard, however, Mr. Blount's opinions are at least relevant to the issue in this case: the propriety of Wachovia's management of the Lehman Investment. Adding Dr. Hubbard's testimony on top of Mr. Blount's adds no substantive value to the case and, indeed, for the reasons stated in this motion, injects irrelevant and misleading issues that may confuse the jury.

5

For these reasons, St. Petersburg respectfully requests that Dr. Hubbard be precluded from offering any opinions at trial.

## ARGUMENT

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining whether to admit expert testimony under this Rule, the Court serves a "critical 'gatekeeping' function." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 n.7 (1993)). It is the responsibility of the Court "to ensure [both] the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In the Eleventh Circuit, courts "engage in a rigorous three-part inquiry" to fulfill this "gatekeeping function." *Id.* Trial courts may admit expert testimony only if the following three requirements are met: "(1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact." *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 790 (11th Cir. 2004).

"The party seeking to introduce expert testimony bears the burden of satisfying these criteria by a preponderance of the evidence." *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2010 U.S. Dist. LEXIS 142815, at *6 (S.D. Fla. August 27, 2010) (excluding expert testimony regarding whether an economic collapse was foreseeable because it was nothing more than "parroting" figures and commentary of other analysts).

As discussed below, Dr. Hubbard's opinions fail to meet the standards of relevance and reliability set forth in *Daubert* and its progeny. Moreover, to the extent that any of the testimony Dr. Hubbard intends to offer is admissible, such testimony would be duplicative of Wachovia's other expert – Edmon T. Blount. For these reasons, Dr. Hubbard should be precluded from offering any testimony at trial.

## I.    DR. HUBBARD'S OPINION THAT THE "MARKET" DID NOT FORESEE THE LEHMAN BANKRUPTCY SHOULD BE EXCLUDED.

Rule 702's requirement that expert testimony "must assist the trier of fact" "goes primarily to relevance." *Daubert*, 509 U.S. 579, 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* Here, Dr. Hubbard's opinion that the "market" did not foresee the Lehman bankruptcy does not relate to the facts of this case, and, therefore, should be excluded. *See id.* ("An additional consideration under Rule 702 – and another aspect of relevancy – is whether the expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute)"

St. Petersburg's theory of liability in this case is that, given what *Wachovia* knew about the increasing risks in the Lehman Investment, it was a breach of *Wachovia's* contractual and fiduciary obligations to St. Petersburg to continue holding the Lehman Investment without advising St. Petersburg of the risks or notifying it of any of the credit rating downgrades. Whether the "market" foresaw the Lehman bankruptcy is wholly irrelevant and, as a result, an

opinion on this matter would not be helpful to the trier of fact. *Boca Raton Cmty. Hosp., Inc. v. Tenet Helathcare Corp.*, 502 F. Supp. 2d 1237, 1248-1250 (S.D. Fla. 2007) (excluding expert evidence when the opinions were based on a regulatory scheme that was not applicable on the grounds that it would not be helpful to the jury and would mislead the jury).

Put simply, the critical issue in this case is what *Wachovia* knew about Lehman. On this issue, Dr. Hubbard acknowledges that he has no opinion as to the "appropriateness of Wachovia's risk assessment of Lehman Brothers because [he does] not know what its risk assessment was." (Hubbard Dep. at 64.) As a result, he cannot even offer an opinion about whether Wachovia's view was consistent with the "market's." Thus, Dr. Hubbard's academic exercise of trying to discern the "market's" view of Lehman is irrelevant, will not assist the trier of fact, and runs the risk of misleading the jury.

## II. DR. HUBBARD'S OPINION THAT THE LEHMAN BANKRUPTCY WAS NOT "REASONABLY FORESEEABLE" SHOULD BE EXCLUDED.

In addition, Dr. Hubbard's opinion that the Lehman bankruptcy was not "reasonably foreseeable" should be excluded because it is not based on sufficient facts or data to be reliable, it will not assist the trier of fact, and it runs the risk of confusing the jury. In particular, during his deposition, Dr. Hubbard defined "reasonably foreseeable" as a "material probability of bankruptcy." (Hubbard Dep. at 73.) Thus, his opinion that the Lehman bankruptcy was not "reasonably foreseeable" means, in effect, that the risk of Lehman declaring bankruptcy was not "material." Dr. Hubbard conceded, however, that whether a risk is "material" is a subjective determination that "would certainly be in the judgment of whoever is making the claim." (Hubbard Dep. at 74.) According to Dr. Hubbard, this determination would depend upon the risk tolerance *of the particular investor*. (Hubbard Dep. at 73-81.)

8

The investor at issue in this case is St. Petersburg. Dr. Hubbard, however, did not review any evidence related to St. Petersburg's risk tolerance. He has not reviewed the St. Petersburg's Securities Lending Investment Guidelines, St. Petersburg's internal investment policy, or any of the depositions of St. Petersburg's representatives. (Hubbard Dep. at 55-56, 58-59, 148.) Accordingly, Dr. Hubbard concedes that he has no knowledge or opinion about St. Petersburg's risk tolerance. (Hubbard Dep. at 148.) As a result, his opinion is subjective, imprecise, and misleading.

**A.** **Dr. Hubbard's Opinion that the Lehman Bankruptcy was Not "Reasonably Foreseeable" is Unreliable because It is Not Based on Sufficient Facts and Data.**

Under Rule 702, an expert's opinion must be "based on sufficient facts or data." Fed R. Evid. 702. Here, based on his own definition of the term, Dr. Hubbard has no basis to testify about whether the risk of bankruptcy was "material" to St. Petersburg or, as a result, whether the bankruptcy was "reasonably foreseeable." *See FTC v. Washington Data Res.*, No. 8:09-cv-2309-T-23TBM, 2011 U.S. Dist. LEXIS 72886, at *3 (M.D. Fla. July 7, 2011) (excluding expert witness from testifying that a reasonable consumer was not likely to be misled by certain marketing practices when the expert's opinion was based on "an incomplete review of pertinent evidence").

Given that Dr. Hubbard does not have any knowledge or opinion about *St. Petersburg's* risk tolerance, the only basis for his opinion that the Lehman bankruptcy was not reasonably foreseeable is his own subjective belief that the risk of bankruptcy was not *material* to him. An expert's opinion, however, must be based on more than the expert's "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 594 (emphasis added). Accordingly, Dr. Hubbard should be precluded from offering any testimony regarding whether the Lehman

9

bankruptcy was "reasonably foreseeable" or whether the risk of bankruptcy was "material." *See*
*Kipperman v. Onex Corp.*, 411 B.R. 805, 844-85 (Bankr. N.D. Ga. August 13, 2009) (excluding
expert economist's opinion that a company was in the "zone of insolvency" when the expert
admitted that his opinion was "subjective" and "a judgment call").

## B. Dr. Hubbard's Opinion that the Lehman Brothers Bankruptcy was Not "Reasonably Foreseeable" Will Not Assist the Trier of Fact and Runs the Risk of Causing Confusion.

In addition, Dr. Hubbard's subjective belief about the risk of Lehman declaring
bankruptcy would not be of any assistance to the jury and would, in fact, run the risk of causing
confusion. In order for expert testimony to be admissible under Rule 702, the proponent of the
testimony must establish that it will be helpful to the jury. *Washington Data Res.*, 2011 U.S.
Dist. LEXIS 72886, at *2 (internal quotations omitted). Expert testimony is helpful if it concerns
matters beyond the understanding of the average lay person. *Id.* In addition, "[b]ecause of the
powerful and potentially misleading effect of expert evidence, sometimes expert opinions that
otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *See*
*Frazier*, 387 F.3d at 1262. In this case, because Dr. Hubbard is unable to define with any
precision what he means by "reasonably foreseeable," his opinion will not help the jury and runs
the risk of causing confusion.

An opinion that an event is reasonably foreseeable, or that there is not a material
probability of that event occurring, indicates a "quantitative idea." *See Frazier*, 387 F.3d at
1265-67 (excluding forensic expert from testifying that the recovery of hair or seminal evidence
"would be expected" when the opinion "expresse[d] an intrinsically probabilistic or quantitative
idea" without any precision). Dr. Hubbard testified, however, that there is "no bright line" for
when an event would be reasonably foreseeable or what level of risk would be material.
(Hubbard Dep. at 73.) According to Dr. Hubbard, somewhere "above [10%] might be something

you would really worry about," but there is no "single calculation that gets you to 10, 20, 30 [percent] or anything else." (Hubbard Dep. at 73-74.) In other words, even if Dr. Hubbard is allowed to testify that the Lehman bankruptcy was not reasonably foreseeable, the jury would still not know whether he believed the probability of Lehman declaring bankruptcy was 1% or 30%. Under these circumstances, this opinion is too imprecise to be of any help to the jury and runs the risk of confusing them. *See Frazier*, 387 F.3d at 1265-1267 (finding that because "the jury could not readily determine whether the [expert's] expectation of finding hair or seminal fluid was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a remote possibility," the opinion "could serve to confuse the jury, and might well have misled it").

Moreover, in this case, Wachovia itself actually determined on August 20, 2008 that the risk of Lehman defaulting before March 2009 (the month the Lehman Investment matured) was 7.26%. (Murphy Dep. at 191-201, Ex. 224.) In particular, Wachovia's credit analyst was expressly asked to calculate the probability that Lehman Brothers would default before March 2009, the month the Lehman Investment matured. (Ex. 224.) In response, Wachovia's credit analyst stated that "[p]er Bloomberg," Lehman Brothers had a "default probability of 7.26%." (Ex. 224.) Whether this risk was "material" in light of St. Petersburg's risk tolerance and the Investment Guidelines is a "matter within the ken of the fact finder, subject to primary evidence" from Wachovia and St. Petersburg. *Washington Data Res.*, 2011 U.S. Dist. LEXIS 72886, at *7. Dr. Hubbard's own subjective opinion about whether this risk was "material" is irrelevant and could mislead the jury. *See id.* (excluding expert testimony regarding whether a reasonable consumer would have been misled by marketing materials because, among other things, "it was just one person's opinion" and was not beyond the understanding of the average lay person).

11

In short, the jury is certainly capable of determining whether a 7.26% chance of default on a \$15,000,000.00 investment is material in light of St. Petersburg's risk tolerance and the Investment Guidelines. Dr. Hubbard's opinion would not be of any assistance to the jury in this regard and is likely to cause confusion. Accordingly, this opinion should be excluded pursuant to Rule 702 and Rule 403 on the grounds that it will not assist the trier of fact and would be unfairly prejudicial to St. Petersburg.

## III.  TO THE EXTENT ANY OF DR. HUBBARD'S OPINIONS ARE ADMISSIBLE, THEY SHOULD BE EXCLUDED BECAUSE THEY ARE DUPLICATIVE OF THE OPINIONS OFFERED BY WACHOVIA'S OTHER EXPERT.

In addition, Rule 403 also provides that "evidence may be excluded if its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Expert testimony, in particular, "may be needlessly cumulative where there is substantial overlap between the areas on which two experts will testify." *Royal Bahamaian Assoc. v. QBE Ins. Corp.*, Case No. 10-21511-CIV-MORENO/GOODMAN, 2010 U.S. Dist. LEXIS 115308, at *4 (S.D. Fla. Oct. 21, 2010) (preliminarily denying plaintiff's motion to exclude expert testimony as duplicative, but directing defendant to coordinate its experts testimony on direct examination to avoid needless duplication and cumulative testimony); *see also Geico Casualty Co. v. Beauford*, Case No. 8:05-cv-697-T-24EAJ, 2007 U.S. Dist. LEXIS 61379, at *11-12 (M.D. Fla. Aug. 21, 2007)(precluding one of two insurance industry experts from testifying at trial as cumulative).

In this case, none of Dr. Hubbard's opinions regarding what the "market" forsaw or whether the Lehman Brothers bankruptcy was "reasonably foreseeable" are admissible. To the extent that Dr. Hubbard intends to express any other opinions that would arguably be admissible at trial, such opinions would be duplicative of Wachovia's other expert in this matter – Edmon

12

W. Blount. Mr. Blount is expected to testify as to why, in his opinion, it was reasonable for Wachovia to continue to hold the Lehman Investment in St. Petersburg's account through the summer of 2008. (Blount Expert Report ¶ 23.) St. Petersburg disagrees with this opinion and will challenge the credibility and reliability of it at trial. Unlike Dr. Hubbard, however, Mr. Blount's opinion is at least relevant to the issues in this case, i.e., whether Wachovia properly managed the Lehman Investment on behalf of St. Petersburg.

Moreover, in forming his opinion, Blount relies on the same types of information as Hubbard. In particular, both Hubbard and Blount relied upon and are expected to testify about (1) Lehman's credit ratings, (2) whether other sophisticated market participants (such as money market mutual funds and local government investment pools) held investments in Lehman, (3) whether Lehman Brothers was in the S&P 500 and S&P 100, and (4) and whether a government bailout could have prevented the Lehman Brothers bankruptcy. Allowing both Dr. Hubbard and Mr. Blount to testify about these facts would be duplicative and would be unfairly prejudicial to St. Petersburg. *Royal Bahamaian Assoc.*, 2010 U.S. Dist. LEXIS 115308, at *5 ("Unnecessarily similar and cumulative expert testimony may create the risk that a jury will resolve differences in expert option by counting heads instead of giving fair consideration to the quality and credibility of each expert's opinions").

## CONCLUSION

For the reasons discussed above, Dr. Hubbard's expected testimony will not assist the trier of fact, is not based on sufficient facts or data, runs the risk of causing confusion, and will be duplicative of the testimony of Wachovia's other expert. Accordingly, under Rule 702, Rule 403, and the principles set forth in *Daubert*, St. Petersburg's motion to exclude Dr. Hubbard from testifying at trial should be granted.

This the 9th day of March, 2012.

CITY OF ST. PETERSBURG, FLORIDA

By its attorneys,

SMITH MOORE LEATHERWOOD LLP

*/s/ Robert R. Marcus*
Robert R. Marcus
N.C. State Bar No. 20041
C. Bailey King, Jr.
N.C. State Bar No. 34043
525 N. Tryon Street, Suite 1400
Charlotte, NC 28202
Telephone: 704.384.2600
Facsimile: 704.384.2800
rob.marcus@smithmoorelaw.com
bailey.king@smithmoorelaw.com

Matthew Nis Leerberg
N.C. State Bar No. 35406
P.O. Box 27525
Raleigh, NC 27611
Telephone: 919-755-8700
Facsimile: 919-755-8800
matt.leerberg@smithmoorelaw.com

JOHN C. WOLFE, CITY ATTORNEY

Jacqueline Kovilaritch
Assistant City Attorney
P.O. Box 2842
St. Petersburg, FL 33731
Telephone: (727) 893-7401
Facsimile: (727) 892-5262
FBN: 380570
Jacqueline.Kovilaritch@stpete.org

*Attorneys for Plaintiff*

14

## **CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 3.01(g), counsel for Plaintiff, the City of St. Petersburg, FL

conferred with counsel for Wells Fargo Bank, N.A. in a good faith effort to resolve the issues

raised by this motion but were unable to reach an agreement on the resolution of the motion.

This the 9th day of March, 2012.

*/s/ C. Bailey King, Jr.*
C. Bailey King, Jr.
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFF'S MOTION IN LIMINE TO**

**EXCLUDE EXPERT OPINIONS OF R. GLENN HUBBARD AT TRIAL AND**

**INCORPORATED MEMORANDUM OF LAW** was filed electronically with the Clerk of

Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of

record. I further certify that the foregoing was served on the following counsel for Defendants

via e-mail:

Mary J. Hackett
Jack Cobetto
K. Isaac deVyver
George Linge
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222

Samuel J. Salario, Jr.
Kevin P. McCoy
CARTLON FIELDS, P.A.
4221 W. Boy Scout Boulevard
Suite 1000
Tampa, FL 33607-5736

This the 9th day of March, 2012.

*/s/ C. Bailey King, Jr.*
C. Bailey King, Jr.
*Attorney for Plaintiff*

# Exhibit A

## Securities Lending Agency Agreement

Nov. 1     This Securities Lending Agency Agreement (the "Agreement") dated as of _____, 2001 sets forth the terms and conditions between **City of St. Petersburg Florida** (in such capacity, the **"Lender"**) and **First Union National Bank** (the **"Agent"**), concerning the lending by the Agent, solely as agent for the Lender and not in its individual capacity, of securities held by the Agent for the Lender in the custody account established pursuant to the Custody Agreement, as amended by this Agreement (the securities held in such custody account from time to time are hereafter referred to collectively as the "Available Securities"), to certain banks, securities brokers and dealers as provided herein. This Agreement shall apply to each such loan of securities, hereinafter referred to individually as a "Loan". Other capitalized terms used herein have the respective meanings specified in section 14. The Agent shall administer any Loans subject to the following terms and conditions:

    1.   Appointment / Selection of Borrowers. The Lender hereby authorizes and appoints the Agent, as agent for the Lender to lend Available Securities of the Lender in accordance with the provisions hereof. The Agent is hereby authorized and agrees to make Loans pursuant to this Agreement only to such banks, securities brokers and dealers (collectively, the "Borrowers") as have been approved by the Lender. Attached hereto, as Attachment A is a list of the Borrowers, each of which has been approved by the Lender as of the date hereof. In addition, the Lender may authorize or direct the Agent to make Loans to additional organizations and entities selected from time to time by Lender as to which Agent has entered into or will enter into a Master SLA (as defined below), which, upon the Lender's approval, shall be added to Attachment A and become Borrowers until further notice from the Lender. Subject to the Lender's approval, Attachment A may also be amended by Agent from time to time to add or delete Borrowers and Agent will notify Lender of each such proposed change provided that the Agent shall not make any Loan of the Lender's securities to any proposed Borrower not previously disclosed to the Lender except after not less than 10 days prior written notice thereof to the Lender. With respect to a deleted Borrower, such change shall be effective immediately upon notification to Lender to such effect. With respect to a proposed additional borrower, unless Lender notifies Agent, within ten days of the giving by Agent of notice of the proposed additional borrower(s), of Lender's disapproval of any such additional borrower(s), Lender agrees that Attachment A shall be deemed amended to add the name(s) of such borrower(s).

    At any time the Lender may direct the Agent to cease lending Available Securities to any Borrower in which event such Borrower shall be deleted from Attachment A and shall cease to be a Borrower until further notice from the Lender.

EXHIBIT / 
$\mathcal{P}LO\omega$ 3 - 22-11

2. <u>Master Securities Loan Agreement</u>. Loans to any Borrowers shall be made only pursuant to a Master Securities Loan Agreement ("Master SLA") in substantially the form attached hereto as Attachment C. The Lender specifically approves such form of agreement and agrees to promptly furnish to Agent its financial statements to enable Agent to comply with any request therefor by Borrower in connection with any Master SLA. The Lender understands and agrees that the Agent may revise in a manner not inconsistent with the provisions of this Agreement, without notice to the Lender, the terms of any Master SLA with any Borrower as the Agent deems necessary or appropriate, in its discretion, for the effectuation of any transaction contemplated hereby or thereby.

The Lender hereby represents that (a) Available Securities are free and clear of any lien, charge or encumbrance except as otherwise created hereunder, and (b) the Lender and any third party having power to dispose of such Available Securities has no present intention to sell such Available Securities. The Lender shall (a) promptly notify the Agent of any change in the availability of such Available Securities for lending, (b) in the event of the sale of any such Available Securities, give notice thereof to the Agent no later than the trade date of such sale, and (c) upon Lender's, or a person's or persons' authorized to act on behalf of Lender, receipt of a notice of buy-in such notice will be immediately electronically transmitted to Agent for retransmission to Borrower and, if such buy-in is executed, Lender or person or persons authorized to act on behalf of Lender will communicate to Agent no later than 3:45 PM Philadelphia time on day of execution the pertinent information regarding such buy-in. The Lender acknowledges that, under the applicable Master SLA, Borrowers will not be required to return loaned securities immediately upon receipt of notice from Agent terminating the applicable loan, but instead will be required to return such loaned securities within the standard settlement period for such securities. Upon receiving a notice from the Lender or person or persons authorized to act on behalf of Lender that Available Securities which have been lent to a Borrower should no longer be considered Available Securities (whether because of the sale of such securities or otherwise), the Agent shall use its best efforts to notify promptly thereafter the Borrower which has borrowed such securities that the loan of securities is terminated and that such securities are to be returned within the standard settlement period for such securities or five (5) business days, whichever is less.

3. <u>Initial Collateral for Loans</u>. As security for each Loan, the Agent shall, on or prior to delivery of the Available Securities to be loaned, receive Collateral (as defined and permitted by the applicable Master SLA) from the Borrower consisting of (a) cash, (b) US government securities, (c) irrevocable letters of credit (individually, a "Letter of Credit"), or (d) such other forms as the Agent and the Lender may from time to time agree in writing in each case of a character and in an amount equal to no less 102% of the market value of the securities loaned in the case of securities of U.S. issuers and 105% of the market value of the securities Loaned in the case of securities of Non-US issuers. The Lender may, by prior notice to the Agent, direct the Agent to accept only certain of the foregoing types of Collateral in respect of Loans made on behalf of the Lender.

2.

4.    Marking to Market.    4.1. The Agent shall compute, pursuant to the applicable Master SLA, daily the Contract Value (as defined in the applicable Master SLA) of all Loaned Securities with respect to each Borrower. If at the close of business on any day for any Loan the market value of the Collateral shall be less than the Contract Value as required under the Master SLA (but in no event to be less than 100% of the market value of the Loaned Securities), the Agent shall demand that such Borrower deliver to it additional Collateral (by delivery of additional cash or securities or an amended or substitute Letter of Credit) in the amount equal to no less than 100% of the Market value of Loaned Securities.

4.2. If, under the Master SLA between the Agent and a Borrower, the market value of the Collateral received with respect to any Loan to such Borrower exceeds the Contract Value of the Loaned Securities with respect to such Loan by an amount sufficient under the Master SLA to permit the Borrower to request an adjustment to the amount of Collateral for such Loan, the Agent is authorized to make such an adjustment (by the return of a portion of the cash or securities or acceptance of an amendment to or substitution for the Letter of Credit previously delivered by such Borrower in respect of Loans), as provided in such Master SLA.

5.    Distributions, Loan Premiums, etc.  5.1.  The Agent shall collect and hold (pursuant to the Lender's instructions) as and when payable by each Borrower amounts equivalent to all Distributions made in respect of Loaned Securities during the term of Loans made to such Borrower.

5.2. Loaned Securities may be transferred into the names of others and the Lender hereby waives on behalf of itself and each person with an interest, beneficial or otherwise, in the Loaned Securities any right to vote the Loaned Securities prior to the termination of the Loan with respect to such Loaned Securities and the right to participate in any dividend reinvestment program attendant to such Loaned Securities during the term of any Loan. The Lender understands and agrees that the identity of Lender shall be disclosed by Agent to a Borrower. .

5.3.    The Agent is authorized to return to Borrowers all interest and other Distributions on Collateral consisting of securities, if any, as provided in the relevant Master SLAs.

6.    Investment of Cash; Maintenance of Collateral Securities.  6.1.  The Lender shall invest cash Collateral received in respect of any Loan, subject to an obligation, upon the termination of the Loan, to return to the Borrower the amount of cash initially pledged (as adjusted for any interim marks-to-market). Unless otherwise agreed, the Lender hereby authorizes and directs the Agent to maintain cash collateral in a separate account maintained by the Agent for the Lender and to invest such cash collateral on behalf of the Lender in accordance with the investment guidelines outlined in Attachment B. Any losses (including any loss of principal) from investing and reinvesting any cash Collateral in accordance with the provisions hereof shall be at the Lender's risk and for the Lender's account. To the extent that earnings on invested cash collateral are insufficient to pay the amount of any rebate payable to a Borrower in respect of any Loan or any investment losses reduce the principal amount of cash below the amount required to

3.

be returned to the Borrower upon the termination of any Loan made on the Lender's behalf (after giving effect to any rebate due Borrower), the Lender will, on demand of the Agent, immediately pay to the Agent (for transmission to such Borrower) an equivalent amount in cash. The Lender acknowledges and agrees that, in respect of any Loan entered into on the Lender's behalf, the Agent may at its option advance its own funds to pay any such rebate or other fees or amounts due Borrower to the extent permitted by applicable law. If the Agent makes any such advance, or if the Lender does not pay to the Agent when due the applicable revenue sharing or fees pursuant to section 10 of this Agreement, the Lender will be liable to the Agent until payment in full of such liability, at a rate per annum (computed daily on the amount of the outstanding liability) equal to 2% above the prime rate of interest of First Union National Bank as announced at its principal office in Charlotte, North Carolina from time to time. As security for any and all obligations of the Lender to the Agent arising hereunder or under any Master SLA or Loan effected on the Lender's behalf at any time and from time to time, the Lender hereby assigns and grants to the Agent a security interest in, and hereby pledges, all of its right, title and interest in, to and under the Custody Account and all cash and securities standing to the credit thereof from time to time, and proceeds thereof.

6.2. Unless otherwise agreed, the Agent will hold for the Lender, for safekeeping, all Collateral consisting of cash and securities received from Borrowers in respect of Loaned Securities either (a) at its own facilities, (b) with a Federal Reserve Bank, the Depository Trust Company or any other depository or clearing corporation of which the Agent is a participant or (c) with a bank sub-custodian approved by the Agent.

6.3. The Agent is authorized to accept substitute Collateral of any type as is permitted hereunder during the term of any Loan so long as the Contract Value in respect of such Loan continues to be satisfied after such substitution.

7. Termination of Securities Loan. The Lender shall have the right to direct the Agent (a) to terminate any Loan with any Borrower at any time and (b) to cease, either temporarily or indefinitely, entering into any new Loans with such Borrowers as from time to time the Lender may designate. The Agent is also authorized in its discretion to terminate, on the Lender's behalf, any Loan entered into with a Borrower without prior notice to the Lender, subject to the conditions of the relevant Master SLA. In the event of the termination of a Loan under any provision of the Master SLA between a Borrower and the Agent (whether or not as a result of the direction of the Lender), the Agent shall (subject to section 12 of this Agreement) receive the Loaned Securities in respect of such Loan and all Distributions thereon delivered by such Borrower as a result of such termination within the standard settlement period for such Loaned Securities, and, in connection with such termination, is authorized to return to such Borrower any Collateral in respect of such Loan, and in the case of Collateral consisting of securities, all Distributions thereon not previously returned to Borrower, to the extent provided in such Master SLA.

8. Reports. The Agent shall provide the Lender with (a) monthly statements (i) describing all Loans entered into pursuant to this Agreement during such month, including the

4.

names of the Borrowers, the Loaned Securities, the Collateral held by the Agent therefor, and the amount of the loan premiums received and the loan rebates paid by the Agent, (ii) stating with respect to such month the amount of any return on cash Collateral invested by the Agent pursuant to section 6 of this Agreement, and (iii) setting forth with respect to such month the amount of the Agent's share of revenues hereunder, and (b) such other information or documentation with respect to Loans entered into hereunder as may be reasonably requested by the Lender from time to time.

9.    Loan Premiums; Loan Rebates. The Agent shall have sole responsibility for negotiating the amount and terms to the extent not otherwise specified in the Master SLA of (a) all loan premiums to be paid by Borrowers in respect of Loans secured by securities Collateral or a Letter of Credit and (b) all loan rebates to be paid by the Agent on behalf of the Lender to Borrowers in respect of Loans secured by cash Collateral. The Agent is authorized to pay any such rebates when and as due to such Borrowers, to the extent of available funds therefor.

10.    Revenue Sharing. The Lender and Agent shall share in the net securities lending revenues generated under this Agreement in the amounts agreed upon from time to time in writing signed by the Lender and the Agent. For purposes hereof "net securities lending revenues" shall mean (a)(i) all loan premium fees derived from Agent's acceptance of non-cash Collateral; plus (ii) all gains and losses, income and earnings from the investment and reinvestment of the Fund's cash Collateral; minus (b) broker rebate fees paid by the Agent to the Borrower.

10.1    Fees. If, under this Agreement, compensation to the Agent shall be in the form of fees the Lender shall pay the Agent for services provided to the Lender at the rates and the amounts agreed upon from time to time in writing signed by the Lender and the Agent.

11.    Representation and Warranties. 11.1. The Agent represents and warrants that:

(a)    The Agent has full legal right, power and authority to execute, deliver and perform this Agreement;

(b)    No contractual or legal obligation exists which would prohibit the Agent from carrying out the transactions contemplated hereby;

(c)    This Agreement has been duly authorized by all necessary corporate action on the part of the Agent and has been duly executed and delivered by one of the duly authorized officers of the Agent; and

(d)    The execution and delivery of this Agreement will not result in any violation of or be in conflict with or constitute a default under any term of the charter or by-laws of the Agent or of any agreement or other instrument, law or judgement applicable to the Agent.

5.

11.2. The Lender represents and warrants that:

(a)  The Lender has full legal right, power and authority to execute, deliver and perform this Agreement;

(b)  No contractual or legal obligation exists which would prohibit the Lender from carrying out the transactions contemplated hereby or the lending of securities hereunder or investment of cash Collateral pursuant hereto;

(c)  This Agreement has been duly authorized by all necessary executive, legislative, governmental and administrative action on the part of the Lender and has been duly executed and delivered by a duly authorized representative of the Lender; and

(d)  The execution and delivery of this Agreement and the performance of the transactions contemplated hereby will not result in any violation or be in conflict with or constitute a default or violation under or violate any law, ordinance, decree or judgment applicable to the Lender or any person having an interest in Available Securities hereunder or any agreement or instrument to which either is a party or by which it is bound.

(e)  The Available Securities are owned by the Lender free and clear of any lien, charge or encumbrance.

12.  Agent's Obligations. 12.1. If the Borrower in respect of any loan made pursuant hereto and pursuant to the relevant securities borrowing agreement ("Master SLA") fails to return loaned securities because it is the subject of a bankruptcy, insolvency, reorganization, liquidation, receivership, conservatorship or similar event (collectively, "Bankruptcy Event"), then Agent shall, at its expense (subject to the succeeding paragraph hereof and to the Lender's Liability for principal losses pursuant to Section 6 of the Agreement) and within 1 business day of the Bankruptcy Event as determined by Agent (the "Indemnity Triggering Date"), credit Lender's account in United States dollars with the difference (where a positive number) ("Indemnifiable Amount") between (A) the market value of such loaned securities on the Indemnity Triggering Date (including, in the case of debt securities, accrued, but unpaid interest and, in the case of equity securities, dividends or distributions declared but not paid or remitted to Lender) and (B) the market value of the related collateral which shall be (i) in the case of loans collateralized solely by cash collateral, the greater of the market value of the cash collateral on the date of initial pledge as adjusted for any subsequent marks-to-market to the Indemnity Triggering Date and the market value of the proceeds of cash collateral investments on the Indemnity Triggering Date, (ii) in the case of loans collateralized solely by securities collateral, the greater of the market value of such collateral on the business day immediately preceding the Indemnity Triggering Date and on the Indemnity Triggering Date, and (iii) in the case of loans collateralized solely by letters of credit, the respective available undrawn amounts on the Indemnity Triggering Date. Where a loan is collateralized by more than one type of collateral, the aggregate market value of collateral

6.

STP0003332

securing such loan (for the purpose of computing the Indemnifiable Amount) shall be the sum of the market values for each relevant type of collateral. Market value shall be determined by Agent, where applicable, by utilizing recognized pricing services or dealer price quotations.

In lieu of paying Lender the Indemnifiable Amount as provided above, Agent may, at its sole option and expense, purchase for Lender's account ("Buy-In") on the Indemnity Triggering Date for settlement in the normal course replacement securities of the same issue, type, class, and series as that of the loaned securities, provided, however, that if Agent effects a Buy-In, Lender agrees that, to the extent of such Buy-In, Agent shall be subrogated to, and Lender shall assign and be deemed to have assigned to Agent, all of Lender's rights in, to and against the Borrower (and any guarantor thereof) in respect of such loan, any collateral pledged by the borrower in respect of such loan (including any letters of credit and the issuers thereof), and all proceeds of such collateral. In the event that Lender receives or is credited with any payment, benefit or value from or on behalf of the Borrower in respect of rights to which Agent is subrogated as provided herein, Lender shall promptly remit or pay to Agent the same (or, where applicable, its United States dollar equivalent).

12.2. The Agent shall not be liable to the Lender or any third party for any loss occasioned by reason of action taken or omitted to be taken by the Agent hereunder or in connection herewith, except as to the indemnification described in paragraph 12.1, or insofar as such loss is occasioned by the Agent's negligence or willful misconduct. The Lender agrees to reimburse the Agent for all losses, damages, taxes (other than income taxes on any fee paid to the Agent pursuant to section 10) and costs and expenses (including, without limitation, costs incurred as a result of proceeding against any Collateral upon a default by a Borrower and all amounts paid in the settlement of claims or satisfaction of judgements and legal fees) which may arise out of (i) any action taken by the Agent pursuant to this Agreement or otherwise upon the instructions of the Lender (except insofar as such losses, damages, taxes and expenses are incurred as a result of the Agent's negligence or willful misconduct) or (ii) the failure by the Lender to fulfill the terms of any Loan or any agreement relating thereto, including this Agreement and any Master SLA, including without limitation, a failure by the Lender to give timely notification to Agent of any sale or change in availability of Available Securities as required by Section 2 of this Agreement.

12.3. In order to be able to carry out Loans hereunder, the Agent is authorized to deposit Available Securities with a Federal Reserve Bank, the Depository Trust Company or any other depository or clearing corporation of which the Agent is a participant or with a bank sub-custodian approved by the Agent. The Agent shall not be liable to the Lender or any third party as a result of any act or failure to act by any Federal Reserve Bank, the Depository Trust Company or any depository or clearing corporation or sub-custodian, or the employees or agents of any of the foregoing, so long as the Agent exercised reasonable care in the selection thereof.

12.4. The Agent may, in its discretion and without notice to the Lender, from time to time appoint one or more persons to act as its sub-agent hereunder or with respect to the loan of

7.

STP0003333

securities held in the custody account established pursuant to the Custody Agreement, and the Lender hereby approves any such appointment. Any reference to the Agent shall deem to mean and include, any sub-agent appointed by First Union. Agent shall have the right, in its discretion, to terminate any appointment of a sub-agent or to modify the terms of any such appointment without notice to the Lender.

13.    Agent's Outside Activities.  The Lender understands that (a) through the Agent's commercial lending, trust or other departments, the Agent may be a creditor of Borrowers for its own account and (b) all requests for Loans from Borrowers will be allotted by the Agent among all of its customers in a manner which in the judgment of the Agent shall be fair and equitable. The Agent shall furnish to the Lender upon request a description of its method for allocating Loans in accordance with the foregoing clause (b), as then in effect.

14.    Definitions.

Custody Agreement:  the Custody Agreement between the Lender and its Custodian.

Distribution:  with respect to any Loaned Securities, or Collateral consisting of securities, any interest, dividend or other payment or distribution of cash, securities or other property including any option, warrant, right, privilege or other security of any kind distributed with respect thereto or in exchange therefor.

Loaned Securities:  with respect to any Borrower, the aggregate of the following (unless otherwise provided in the Master SLA):

(a)    all securities which the Agent shall deliver to such Borrower pursuant to a Loan;

(b)    all securities distributed with respect to or in exchange for any Loaned Securities, including securities distributed as a result of any stock split or stock dividend;

(c)    all securities received in exchange for Loaned Securities in connection with (i) a merger in which the issuer of such Loaned Securities is not the surviving corporation or (ii) a sale of substantially all the assets of such issuer; and

(d)    all securities for which Loaned Securities are exchanged in connection with any recapitalization of the issuer of such Loaned Securities.

8.

STP0003334

15.   ERISA.   Where the Lender is a plan subject to the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Lender agrees to promptly notify the Agent if at any time:

(a)   any potential borrower which is a broker-dealer registered under the Securities Exchange Act of 1934, as amended (the "1934 Act"), a broker-dealer exempted from registration under Section 15(a)(1) of the 1934 Act as a dealer of exempted U.S. Government securities, or a bank (or any of such potential borrower's affiliates, as defined in Department of Labor Prohibited Transaction Exemption 81-6) has discretionary authority or control with respect to the investment of any Available Securities, or renders investment advice (within the meaning of 29 CFR  2510.3-21(c)) with respect to any Available Securities, or

(b)   any potential borrower not described in clause (a) above is a party-in-interest with respect to the Lender (within the meaning of  3(14) of ERISA) or a disqualified person with respect to the Lender (within the meaning of  4975(e) (2) of the Internal Revenue Code of 1986, as amended).

If the Lender provides such notice, the Agent shall take appropriate action to prevent the Lender from engaging in a loan of securities that would constitute a prohibited transaction (as described in Section 406 of ERISA) with any potential borrower so identified by the Lender.  The Agent shall be entitled to rely conclusively upon such notice from the Lender.

16.   Tax Considerations.   The Lender acknowledges that any payment of distributions from a Borrower to the Lender are in substitution for the interest or dividend accrued or paid in respect of Loaned Securities and that the tax treatment of such payment may differ from the tax treatment of such interest or dividend.  The Lender acknowledges that it has made its own assessment and evaluation of the tax consequences to it of any Loan permitted to be effected hereunder.

17.   The parties acknowledge that:

THE PROVISIONS OF THE SECURITIES INVESTOR PROTECTION ACT OF 1970 MAY NOT PROTECT THE LENDER WITH RESPECT TO THE SECURITIES LOAN TRANSACTION AND THAT, THEREFORE, THE COLLATERAL DELIVERED BY THE BROKER OR DEALER, AS BORROWER, TO THE LENDER MAY CONSTITUTE THE ONLY SOURCE OF SATISFACTION OF THE BROKER'S OR DEALER'S OBLIGATION IN THE EVENT THE BROKER OR DEALER FAILS TO RETURN THE SECURITIES.

18.   Execution of Documents.   The Lender hereby authorizes and empowers the Agent to execute in the Lender's name and on its behalf and at its risk all agreements and documents as may be necessary or appropriate in the judgment of the Agent to carry out the

9.

purposes of this Agreement. The Agent is authorized to supply any information regarding the Lender and any Loan effected pursuant hereto which is required by applicable law.

19.    Termination. This Agreement may be terminated at the option of either party upon no less than 30 days' prior written notice of termination to the other party. Concurrent with the termination date of this Agreement, no further Loans will be made and unless otherwise directed in writing by the Lender, the Agent shall terminate any Loans which remain outstanding in accordance with the Master SLA's applicable to such Loans. The provisions hereof shall continue in full force and effect in all other respects until all Loans have been terminated and all obligations satisfied as herein provided.

20.    Notices. All notices, demands and other communications hereunder shall be in writing and delivered or transmitted (as the case may be) by registered mail, facsimile, telex or courier, or be effected by telephone promptly confirmed in writing and delivered or transmitted as aforesaid, to the intended recipient as set forth below. Notices shall be effective upon receipt.

(a)    if to the Lender, at            (b)    if to the Agent, at

City of St. Petersburg Florida            First Union National Bank
One Fourth Street N.            Securities Lending Division
St. Petersburg, FL 33701            PA4937
            123 South Broad Street
            Philadelphia, PA 19109

Attention: Jeffrey G. Spies            Attention: Alba M. Suarez
Tel #: 727-892-5113            Tel #: (215) 670-4521
Fax #: 727-893-7120            Fax #: (215) 670-4798

or to such other addresses as either of the parties shall have furnished to the other in writing.

21.    Custody Agreement. Insofar as the terms of the Custody Agreement are inconsistent with, or require written instructions or a separate written agreement to permit performance of, this Agreement, such terms shall be deemed amended, such instructions given and such agreement entered into by the parties hereunder, to the extent necessary to permit the performance of this Agreement in accordance with its terms in connection with the transactions contemplated hereby. As so amended by the preceding sentence, the Custody Agreement is ratified and confirmed to be in full force and effect. All terms and conditions of the Custody Agreement consistent with this Agreement are hereby ratified and confirmed to be in full force and effect in this Agreement.

22.    Miscellaneous. This Agreement embodies the entire agreement and understanding between the parties and supersedes any other agreement between the parties concerning securities lending. This Agreement may not be changed, amended or modified except

10.

by an instrument in writing signed by each of the parties hereto. The headings in this Agreement are for convenience of reference only and shall not expand, limit or otherwise affect the meaning hereof. This Agreement shall not be assignable by either party hereto without the written consent of the other and shall be governed by and construed in accordance with the State of New York law. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of each party hereto and its successors and permitted assigns.

City of St. Petersburg Florida

First Union National Bank

By _____ 10/19/01
Name: Rick Baker        Date
Title: Mayor

By _____ 10/31/01
Name: Alba M. Suarez      Date
Title: Vice President

APPROVED AS TO CONTENT:

.................
CITY ATTORNEY (Designee)
      RICHARD B. BADGLEY
By.................
  Assistant City Attorney

APPROVED AS TO FORM:

.................
CITY ATTORNEY (Designee)

By.................
  Assistant City Attorney

*Per Mary Doonan*
*- Jeff Spies*
*says form section*
*doesnt need to be*
*billed in*

11.

STP0003337



ATTACHMENT A

## City of St. Petersburg Florida
### APPROVED BORROWERS FOR SECURITIES LENDING

| | | |
|---|:---:|---|
| Abbey National Securities Inc. | X | |
| ABN Amro, Inc | X | |
| ABN Amro Bank, NV | X | |
| Banc of America Securities, LLC | X | |
| Bank of Nova Scotia | X | |
| Barclays Capital, Inc | X | |
| Bear Stearns & Co. | X | |
| Bear Stearns International Limited | X | |
| Bear Stearns Securities Corp. | X | |
| BMO Capital Markets Corp. | X | |
| BNP Paribas Securities Corp. | X | |
| Cantor Fitzgerald & Co. | X | |
| Citigroup Global Markets Inc. | X | |
| Countrywide Securities Corp. | X | |
| Credit Suisse Securities (USA) LLC | X | |
| Deutsche Bank Securities, Inc. | X | |
| Dresdner Kleinwort Wasserstein Securities, LLC | X | |
| Fortis Bank | X | |
| Fortis Securities, LLC | X | |
| Goldman Sachs & Co. | X | |
| Greenwich Capital Markets, Inc. | X | |
| HSBC Securities (USA), Inc. | X | |
| ING Financial Markets, LLC | X | |
| Jefferies & Company, Inc. | X | |
| J.P. Morgan Securities, Inc. | X | |
| Lehman Brothers, Inc. | X | |
| Lehman Commercial Paper, Inc. | X | |
| Merrill Lynch Government Securities, Inc. | X | |
| Merrill Lynch Pierce, Fenner & Smith, Inc. | X | |
| Morgan Stanley & Co. Inc | X | |
| Nomura Securities International, Inc | X | |
| RBC Capital Markets Corp | X | |
| SG Americas Securities LLC | X | |
| Societe Generale | X | |
| UBS Securities LLC | X | |
| WestLB AG | X | |

STP0003338

Limits are set at 25% of the Market Value of lendable assets. Compliance shall be determines on a trade date basis. It is recognized that changes in market value may result, temporarily, in situations where percentage limitations are exceeded. In these situations, there will be a one business day grace period for open or overnight loans; term loans may be carried to maturity with no additions.

Approved this _12TH_ day of _September_, 2006

By: _____
City Of St. Petersburg Florida

STP0003339

## SECURITIES LENDING INVESTMENT GUIDELINES

The following investment guidelines govern the investment activity of collateral in the City of St. Petersburg Florida Securities Lending program ("Lender") with First Union National Bank ("Agent") and it's sub-agent (Metropolitan West Securities, Inc.).

### I.  INVESTMENT SUMMARY AND PORTFOLIO STRUCTURE

There are three objectives to managing the collateral portfolio. The primary objective is to provide safety of principal while earning a positive spread to the rebate rate on securities lent. The second objective is to provide adequate daily liquidity for the collateral portfolio, and the third objective is to obtain the highest yield possible within the parameters of these guidelines.

### A.  Safety of Principal

1. All credit restrictions and rating requirements pertain to the time of purchase.

2. A downgrade in credit rating does not by itself require immediate liquidation of the security, but does require prompt review by the Lender regarding the appropriateness of holding the security if the time to maturity exceeds seven days. The Lender will be notified promptly by Agent of such downgrade and asked for specific written instructions as to the possible disposition of that security, provided the maturity of the downgraded security exceeds 7 days.

3. All investments made in the Lender's collateral portfolio shall be segregated from the investments made on behalf of other participants in the First Union Securities Lending program, unless otherwise instructed and agreed by the Lender, Agent and designated sub-agent.

### B.  Liquidity

1. Assets should be held until maturity under usual circumstances, and after effecting admissions and withdrawals, not less than 10% of the total collateral investments value of the remaining assets must be composed of cash and cash equivalent investments which will mature on the next business day.

2. The First Union Securities Lending program will be a matched program. The definition of "matched" shall mean all fixed rate and floating rate investments will have a loan that is matched to it with respect to amount, reset features, and maturity. The maturity date of a floating rate security will be defined as the next reset date.

## II. INVESTMENT DIVERSIFICATION REQUIREMENTS

When the collateral portfolio is under $150 million, total exposure to any individual issuer shall not exceed $15 Million. When the collateral portfolio is equal to or greater than $150 million, total exposure to any individual issuer shall not exceed the lesser of $50 million or 10% of the collateral portfolio at the time of purchase. The following types of securities are exempt from the individual issuer limit: 1) Repurchase Agreements and 2) Money Market Funds and 3) U.S. Government issues fully guaranteed as to both principal and interest by the U.S. Government or agencies and instrumentalities thereof.

## III. PROHIBITED INVESTMENTS

The collateral portfolio is not allowed to hold the following:

Derivative Securities - Defined as Inverse Floaters, Yield Curve Notes, Range Floaters, Futures Contracts, Interest Only Strips, Principal Only Strips, Leveraged (or Deleveraged) Floating Rate Securities, CMT Based Floating Rate Securities, Dual Index Floating Rate Securities and COFI-Based Floating Rate Securities.

In addition, liabilities of First Union Corporation or any of its affiliates shall not be permissible investments unless specifically authorized in writing by the owner of the loaned securities.

## IV. PERMISSIBLE INVESTMENTS

Acceptable investments will consist of fixed income securities (defined by the parameters of these guidelines), from issuers as follows:

A.  Securities of the U.S. Government or agencies thereof.

B.  Commercial Paper (both with and without credit enhancement), Bankers' Acceptances, Certificates of Deposit, Time Deposits, and Bank Notes – rated at least A1 or PI or its equivalent by at least two credit rating agencies.

STP0003341

ATTACHMENT B

    C. <u>Repurchase Agreements</u> – Must be collateralized at a minimum of 102%. These investments shall be effected on a DVP basis and or held by a tri-party Custodian. See attached Appendix A for a list of "Acceptable Collateral for Repurchase Agreements." Any additions or deletions to Appendix A must be approved by the Lender, agent and it's designated sub-agent.

    D. <u>Floating Rate Securities</u> - The coupons of which adjust to market interest rates at least quarterly, meet the quality criteria outlined above, and have maturities or average lives of three years or less. In the case of asset-backed securities and mortgage-backed securities, the average life shall be 36 months or less, using the most current prepayment assumptions. Capped floating rate securities will have a capped loan matched to its maturity.

    E. <u>Fixed Rate Securities</u> - Maturities of fixed rate securities shall not exceed 18 months. Fixed rate <u>asset-backed securities</u> shall have a final payment of principal occurring in 30 months or less, with an average life of 18 months or less, using the most current prepayment assumptions.

    F. <u>Money Market Mutual Funds</u> - As defined by SEC Regulation 270.2a-7. Investment in any one fund not to exceed 10% of the total net assets of the Fund at the time of purchase.

    G. <u>Sweep Accounts and Short Term Investment Funds</u> – Only those offered by the Custodial Bank.

    H. <u>Master Notes, Promissory Notes and Funding Agreements</u> - Must be issued by companies or their subsidiaries whereby the issuer or its guarantor, is rated A1 by Standard and Poor's or an equivalent rating from another nationally recognized securities rating organization. The instrument must have a put date or final maturity of 91 days or less.

ATTACHMENT B

## V. COMPLIANCE

Compliance shall be determined on a trade date basis. It is recognized that changes in collateral portfolio balances may result, temporarily, in situations where percentage limitations are exceeded. There will be a one-business day grace period on these situations that result from changes in these balances for open, or overnight, investments. Term investments may be carried to maturity, with no additions.

APPROVED

_____, AS
Lender's Signature   mayor of
                     St. Petersburg

_6/29/01_
Date

Jeffy Spice
Assistant Finance Director

7/2/01

## APPENDIX A

### ACCEPTABLE COLLATERAL TYPES FOR REPURCHASE AGREEMENTS

1.) Treasury and Agency Debentures
- Treasury and Domestic Agency securities
- Treasuries and Domestic Agency securities will be collateralized at 102%
- International Agency securities, including WLDB, IBRD, IADB, IFCO, ADBB, and AFDB, will be collateralized at 104%

2.) Agency Pass-Throughs and Agency CMO's/Remics
- Securitized pass-through securities issued by FNMA/FHLMC/GNMA/and CMO's/remics created off those securities
- Tranche types of IO's/PO's/Inverse Floaters/and Z's are NOT acceptable as collateral
- Collateralized at 102%

3.) Money Market Securities (including Commercial Paper, Certificates of Deposit, etc.)
- Rated either $A_1$ or $P_1$
- Collateralized at 102%

4.) Asset-backed Securities
- Asset-Backed securities rated BBB- or better
- Collateralized at 104%

5.) Whole Loan Mortgages including residential and Non-Agency CMO's
- Residential whole loans
- Private securitized mortgage pass-throughs and CMO's rated BBB- or better
- Tranche types of IO/PO/Inverse Floater/and Z's are not acceptable
- Collateralized at 104%

Attachment D

## REVENUE SHARING

All revenue shall accrue daily and shall be apportioned as follows: 60% to **The City of St. Petersburg Florida** (Lender) and 40% to **First Union National Bank** (Agent).

Net earnings shall include the difference between (i) the sum of income received from the investment of Collateral received in securities loans, loan fees received from securities loans, and fees paid by a Borrower on loans collateralized with Collateral other than Cash Collateral; and (ii) any rebate paid to a Borrower if one was named as agent for such Borrower, and any other allocable fees and expenses in connection with securities loans. Agent shall forward to Lender monthly, its allocation of revenue. Agent shall forward to Lender monthly, the allocation of revenue between Lender and Agent. Within two (2) days after receipt of such allocation, Lender shall instruct its Custodian to remit to Agent, Agent's allocation of revenue.

# Exhibit B

CONFIDENTIAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

-------------------------------------------------------x

CITY OF ST. PETERSBURG, FLORIDA  :    Case 8:10-cv-693-T-26TBM
                               :

         Plaintiff,       :

                               :

    vs.                        :

                               :

WELLS FARGO BANK, N.A.,      :

                               :

         Defendant.     :

-------------------------------------------------------x

**EXPERT REPORT OF ROBERT GLENN HUBBARD**

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**



CONFIDENTIAL

| I. | INTRODUCTION | 3 |
|---|---|---|
| A. | QUALIFICATIONS | 3 |
| B. | ASSIGNMENT | 4 |
| C. | DATA AND INFORMATION CONSIDERED | 6 |
| D. | SUMMARY OF CONCLUSIONS | 6 |
| II. | RESEARCH APPROACH AND METHODOLOGY | 8 |
| III. | BACKGROUND | 11 |
| IV. | THE MARKET PRICES OF LEHMAN'S DEBT, EQUITY, AND CREDIT DEFAULT SWAPS DID NOT INDICATE THAT BANKRUPTCY WAS REASONABLY FORESEEABLE | 13 |
| A. | LEHMAN'S BOND PRICES DID NOT INDICATE A BANKRUPTCY FILING WAS REASONABLY FORESEEABLE | 13 |
| B. | ANALYSIS OF LEHMAN'S STOCK PRICE AND MARKET CAPITALIZATION DID NOT INDICATE BANKRUPTCY WAS REASONABLY FORESEEABLE | 17 |
| C. | LEHMAN'S CREDIT DEFAULT SWAP SPREADS DID NOT INDICATE BANKRUPTCY WAS REASONABLY FORESEEABLE | 20 |
| V. | SOPHISTICATED MARKET PARTICIPANTS AND ANALYSTS DID NOT REASONABLY FORESEE LEHMAN'S BANKRUPTCY | 25 |
| A. | CREDIT RATINGS AND CREDIT AGENCIES' COMMENTARY DID NOT INDICATE LEHMAN'S BANKRUPTCY FILING WAS REASONABLY FORESEEABLE | 25 |
| B. | EQUITY ANALYSTS' COVERAGE AND RECOMMENDATIONS DID NOT INDICATE A BANKRUPTCY FILING WAS REASONABLY FORESEEABLE | 31 |
| VI. | OTHER MARKET EVIDENCE INDICATES THAT LEHMAN'S BANKRUPTCY WAS NOT REASONABLY FORESEEABLE | 35 |
| A. | LEHMAN'S BANKRUPTCY WAS NOT REASONABLY FORESEEABLE EVEN IN THE FINAL WEEKS BEFORE LEHMAN'S COLLAPSE BECAUSE OTHER ACTIONS COULD HAVE PREVENTED BANKRUPTCY | 35 |
| B. | OTHER SOPHISTICATED MARKET INVESTORS HELD LEHMAN SECURITIES AT THE TIME OF BANKRUPTCY | 40 |
| VII. | LEHMAN'S COLLAPSE IS CONSISTENT WITH THE "RUN ON THE BANK" PHENOMENON | 43 |

CONFIDENTIAL

VIII.   THE FREED REPORT MISCHARACTERIZES THE EVIDENCE ON LEHMAN,
        DRAWING THE ERRONEOUS CONCLUSION THAT THERE WERE
        UNMISTAKABLE WARNINGS IN THE MARKET ................................................ 46

A.      THE FREED REPORT'S FINANCIAL HISTORY OF LEHMAN IS NOT SUPPORTED BY MARKET
        PRICES ................................................................................................................ 46

B.      THE SELECTION BIAS IN THE ARTICLES CITED IN THE FREED REPORT UNDERMINES ITS
        CONCLUSIONS ...................................................................................................... 47

C.      THE FREED REPORT'S FINANCIAL HISTORY OF LEHMAN MISCHARACTERIZES QUOTATIONS
        FROM NEWS ARTICLES AND ANALYSTS' REPORTS ............................................... 51

CONFIDENTIAL

## I.    Introduction

### A.    Qualifications

1.    My name is Robert Glenn Hubbard. I am the Dean of the Graduate School of Business of Columbia University, where I hold the Russell L. Carson Professorship in Finance and Economics. In addition, I am a Professor of Economics in the Department of Economics of the Faculty of Arts and Sciences. At the National Bureau of Economic Research, I am a Research Associate in programs on corporate finance, public economics, industrial organization, monetary economics, and economic fluctuations and growth. I have taught undergraduate and graduate courses in economics for 27 years, including *Principles of Economics, Intermediate Microeconomics, Intermediate Macroeconomics, Quantitative Methods in Policy Analysis, Entrepreneurial Finance, Future of Financial Services, Public Finance, and Money and Financial Markets.* I am a director of ADP, Inc.; BlackRock Closed-End Funds; KKR Financial Corporation; and Met Life.

2.    From 2001 to 2003, I served as Chairman of the President's Council of Economic Advisers. Over that time period, I also served as Chair of the Economic Policy Committee for the Organization for Economic Co-operation and Development in Paris. Prior to joining the Columbia faculty as Professor of Economics and Finance in 1988, I taught in the Department of Economics at Northwestern University. I have also served as Visiting Professor of Business Administration at Harvard Business School, John M. Olin Visiting Professor at the University of Chicago, Visiting Professor and Research Fellow of the Energy and Environmental Policy Center at the John F. Kennedy School of Government, and John M. Olin Fellow at the National Bureau of Economic Research. I hold A.M. and Ph.D. degrees in economics from Harvard University, and B.A. and B.S. degrees in economics from the University of Central Florida, *summa cum laude*.

3

CONFIDENTIAL

3. As an economist, I have examined the evolution and behavior of a wide range of firms and industries, and I have published a variety of peer-reviewed empirical studies of market structure and firm behavior. I have authored more than 100 publications, edited a number of books, and authored a leading textbook on money and financial markets and a textbook on principles of economics.

4. I have been an advisor or consultant to the Board of Governors of the Federal Reserve System, Congressional Budget Office, Federal Reserve Bank of New York, Internal Revenue Service, International Trade Commission, National Science Foundation, U.S. Department of Energy, and U.S. Department of the Treasury. From 1991 to 1993, I served as Deputy Assistant Secretary (Tax Analysis) of the U.S. Department of the Treasury, where I was responsible for economic analysis of tax policy, the administration's revenue estimates, and health care policy issues. My *curriculum vitae*, which is attached as Appendix A, provides more biographical details and lists my writings. Appendix B lists my testimony in the past four years.

5. I am being compensated at an hourly rate of $1,200 for time spent on this matter. Employees of Analysis Group, Inc., an economic research and consulting firm, working under my direction and supervision, have assisted me in this assignment. In addition, I receive compensation based on the professional fees of Analysis Group. None of my compensation is contingent upon my findings or on the outcome of this litigation.

## B. Assignment

6. I have been retained by Reed Smith LLP, Counsel for Defendants, Wells Fargo Bank, N.A., ("Defendants" or "Wachovia"), in conjunction with the case caption referenced above.

7. In its complaint, the City of St. Petersburg ("Plaintiff" or "St. Petersburg") alleges that Defendants inappropriately invested and held cash collateral through the Bank's securities lending program in "risky" Lehman Brothers Holdings Inc.

CONFIDENTIAL

("Lehman") securities.[1] I have been asked by Counsel for Defendants to review and comment on the arguments and opinions advanced in the Expert Report of Laurence T. Freed submitted on behalf of the Plaintiff.[2] My focus on certain specific arguments and opinions in the Freed Report in no way implies that I agree with the other arguments and opinions expressed in the report. The Freed Report argues, among other things, that:

- "In the year prior to the Lehman bankruptcy, there were unmistakable warning in the market place and the financial press that Lehman Brothers was facing severe and critical problems."[3]

- "[T]he fate of Lehman had been foreshadowed by numerous events including the collapse of the Bear Stearns hedge funds…, the implosion of the Structured Investment Vehicle… and Asset Backed Commercial Paper… markets…, and the failure of Bear Stearns…"[4]

8.  Specifically, I have been asked by Counsel for Defendants to address these arguments and assess whether the bankruptcy filing of Lehman on September 15, 2008 was reasonably foreseeable between July 1, 2007 and September 12, 2008.[5]

---

[1]  Complaint, ¶¶ 49 and 77.

[2]  Written Report of Laurence Freed, July 27, 2011 (the "Freed Report"), in the Litigation City of St. Petersburg, Florida v. Wells Fargo Bank, National Association.

[3]  Freed Report, p. 7.

[4]  Freed Report, p. 7.

[5]  From an economic perspective, examining whether Lehman's bankruptcy was reasonably foreseeable is equivalent to examining whether Lehman's default on the at-issue senior unsecured note was reasonably foreseeable. For Lehman, a bankruptcy event necessarily implies a default event of the at-issue senior unsecured note, because a bankruptcy process curtails payments made by Lehman. Similarly, a default event on Lehman's at-issue senior unsecured note also implies a bankruptcy event since a default on the at-issue senior unsecured note will trigger a bankruptcy filing. Because these concepts are equivalent, I equate the risks of defaulting on the at-issue note with the risks of filing for bankruptcy. The Plaintiff acknowledge: "Because the Lehman bonds were corporate bonds, the risk that Lehman would default on those bonds was directly related to the financial health of Lehman Brothers itself." See Complaint ¶50.

CONFIDENTIAL

I hold all of my opinions as provided in this Report, and as may be expressed at trial, to a reasonable degree of professional certainty.

## C.   Data and Information Considered

9.    In preparing this Report, I relied upon my education and experience in the areas of finance, economics, and investments; publicly available information, such as equity analyst research reports, Securities and Exchange Commission ("SEC") filings, credit agency reports, and data from Bloomberg, Capital IQ, and the Center for Research in Security Prices ("CRSP"); and other materials. Appendix C lists documents that I have reviewed in connection with this matter.

## D.   Summary of Conclusions

10.   Based upon the analyses I have performed and my review of pertinent materials, I disagree with the Freed Report's contention that the Lehman collapse was "foreshadowed" and that there were "unmistakable warnings" in the marketplace.[6] In fact, the market evidence indicates the Lehman bankruptcy was not reasonably foreseeable. I conclude that Lehman's bankruptcy was not reasonably foreseeable for the following reasons:

- Lehman's bond prices generally traded above 90 cents on the dollar, and most of the time above 95 cents on the dollar, until the week preceding its Chapter 11 filing on September 15, 2008. Similarly, the Lehman at-issue note traded above 95 cents on the dollar until the week preceding Lehman's Chapter 11 filing on September 15, 2008. Lehman's bond prices and changes in bond prices were inconsistent with investors' expectations of other firms near bankruptcy.

- Lehman's stock price performance was consistent with that of its peers; it did not decline precipitously until the last seven days preceding the firm's

---

[6]    Freed Report, p. 7.

6

CONFIDENTIAL

Chapter 11 filing. Lehman's stock price performance was not consistent with a pending bankruptcy filing.

- Until one week before bankruptcy, one-year and five-year credit default swap spreads for Lehman followed a pattern similar to the one-year and five-year credit default swap spreads of relevant comparable firms that did not file for bankruptcy. Furthermore, Lehman's one-year and five-year credit default swap spread pattern was different from the pattern exhibited by firms that did file for bankruptcy.

- Credit rating agencies gave investment grade credit ratings to Lehman throughout 2007 and until the day Lehman filed for bankruptcy, indicating a very low expected probability of default. Firms with the ratings assigned to Lehman experienced historical two-year default rates of 0.2 percent or lower.

- Equity analysts overwhelmingly recommended either buying or holding Lehman's stock over the entire period from June 1, 2007 through September 12, 2008.

- Following the government-assisted acquisition of Bear Stearns in March 2008, many market participants believed the Federal Reserve would also provide financial support to Lehman before it failed.

- Despite the economic environment and the increased risk of securities issued by financial institutions, many sophisticated investors with conservative investment mandates continued to hold Lehman securities through 2008 and up to its bankruptcy.

- The collapse of Lehman on September 15, 2008 is consistent with a classic run on the bank, which is not reasonably foreseeable.

11. Moreover, examination of the evidence that the Freed Report puts forward to support its conclusion is contradicted by market indicators. Despite arguing that "useful information about the credit quality of the issuer includes more than credit ratings—there are also the issuer's stock price, its credit spreads and its earnings announcements, among other data," the Freed Report ignored much of this

7

CONFIDENTIAL

information in its assessment of Lehman. As I show below, these market indicators show that Lehman's bankruptcy filing was not reasonably foreseeable.

12. Finally, the Freed Report's "summary narrative of the financial history of Lehman" is a biased selection of news articles and analysts' reports.[7] Many of his excerpts and quotations are misleading and overstate market participants' concerns about Lehman. Not only is his analysis refuted by other news articles and analysts' reports, it is contradicted by many market indicators such as Lehman's bond prices.

13. My opinions, and the bases for my opinions, are given in this Report and the attached exhibits. I am prepared to testify at trial on the topics referenced in this Report. I am also prepared to provide any additional relevant background. I reserve the right to make any necessary corrections and additions to my Report, and to modify my opinions should any new or additional evidence become available.

14. My Report is organized as follows. Section II describes my research approach and methodology. Section III provides a brief background on Lehman. Section IV analyzes the market consensus regarding Lehman securities. Section V evaluates Lehman's viability expectations of sophisticated market participants, that is, credit rating agencies and equity analysts. Section VI examines other sophisticated market participants that held Lehman securities at the time of its bankruptcy. Section VII describes how Lehman's collapse was consistent with the run on the bank phenomenon. Finally, Section VIII addresses arguments made by Laurence Freed in Plaintiffs' expert report.

## II. Research Approach and Methodology

15. I examine the foreseeability of Lehman's bankruptcy by analyzing information typically used by market participants and economists to evaluate financial risk.

---

[7] Freed Report, p. 7.

CONFIDENTIAL

Importantly, my analysis is based on the interpretation of information available to market participants at the time. The use of hindsight to assess the foreseeability of Lehman's bankruptcy filing introduces biases into the analysis that would increase the likelihood of an incorrect conclusion. For example, an article in *The Wall Street Journal* on September 16, 2008 (the day after Lehman's bankruptcy filing) stated: "Before Sunday, not even most people on Wall Street really believed that Lehman would go bust... But by Monday morning, everyone's beliefs had already been retroactively revised; suddenly, Lehman's bankruptcy had been 'inevitable.' Psychologists call this hindsight bias – the uncanny feeling that 'I knew it all along.'"[8]

16. In my analysis, I rely primarily on market prices and market indicators, as this information incorporates the general sentiment of the market. Furthermore, prices are the acid test of market sentiment because they reflect the economic equilibrium of buyers and sellers rather than mere opinions. The market indicators I use include Lehman bond prices, Lehman stock prices, and the spreads on Lehman's credit default swaps. The Freed Report concurs in the use of these measures: "...useful information about the credit quality of the issuer includes more than credit ratings – there are also the issuer's stock price, its credit spreads and its earnings announcement, among other data..."[9] These market-based metrics, as a whole, provide a strong indication of the collective judgment of the many buyers and sellers that constitute the market. Because of the financial incentives involved, market participants have strong motives to be as accurate as possible. As I will show, these market indicators support my conclusion that Lehman's bankruptcy was not reasonably foreseeable.

17. I supplement this analysis of market indicators and financial metrics with qualitative information provided by market participants such as equity analysts,

[8] Zweig, J., "How to Handle a Market Gone Mad," *The Wall Street Journal*, September 16, 2008, available at http://online.wsj.com/article/SB122152121190739301.html, viewed on July 13, 2011.

[9] Freed Report, p. 5.

9

credit rating agencies and analysts, and other market commentators. The ratings and the commentary from the credit rating agencies are the result of in-depth analyses of publicly available and non-public information. Credit ratings were at all relevant times—and still are—widely used by investors, regulators, and other market participants to assess the risk of default. Equity analysts gather and analyze information about companies and their financial prospects.

18.    Throughout the Report, I compare Lehman's performance to two sets of comparable groups. The first set consists of other large companies that filed for bankruptcy between January 1, 2007 and December 31, 2009, where I define large as companies with more than $1 billion in assets.[10,11] I further divide this group into two subcategories, "banking and financial companies" and "companies in other industries."[12] The second set consists of peer financial companies that did not file for bankruptcy.[13] I define peer financial companies as all other standalone U.S. investment banks and financial institutions with more than $100 billion in assets.[14]

---

[10]    Companies with more than $1 billion in assets that filed for bankruptcy between January 1, 2007 and December 31, 2009 are identified using data from BankruptcyData.com.

[11]    A cut-off of $1 billion is chosen to focus on large firms that would be more comparable to Lehman, which had $600 billion in assets at the time of its bankruptcy according to Lehman's Form 8-K, filed September 10, 2008, p. 19. As a robustness check, I estimate results with different cut-off points. For example, I examine companies with at least $10 billion, $50 billion, or $100 billion in assets. None of these alternative analyses yield meaningfully different results.

[12]    Although Lehman is more similar to banking and financial companies than to companies in other business sectors, I still compare Lehman to this second group as a robustness check to my analysis.

[13]    All but one of the peer financial companies retained investment-grade ratings throughout the analyzed time period. Furthermore, all of these companies continued to pay their obligations as the obligations became due. See Capital IQ. Investment grade indicates a rating of AAA to BBB. Downes, J., and Goodman, J.E., *Dictionary of Finance and Investment Terms (Barron's Financial Guides)*, Seventh Edition, Barron's Educational Series, 2006, p. 356.

[14]    Banking and financial institutions are identified by Capital IQ. This set of banking and financial institutions is limited to firms that: (1) have $100 billion or more in assets as of June 30, 2007; (2) are headquartered in the United States; (3) are not a government organization or a government sponsored enterprise; and (4) did not file for bankruptcy. National City Corp. and Wachovia Corp. are included as comparable financial institutions, as these companies had not been acquired as of September 15, 2008. Additionally, in certain parts of my analysis (bond price and CDS spread analysis), I replace General Electric and Ford Motor Co. with their financial subsidiaries,

CONFIDENTIAL

19. In this report, I analyze the sentiment of the collective market, focusing on market participants' beliefs and expectations, as exemplified by their actions and prices. The sentiments of a few select individual investors are not representative of the belief of the majority of investors at the time. I am aware, for example, that certain investors, such as hedge fund manager David Einhorn, raised concerns about Lehman's viability during late 2007 and early 2008, but these concerns were by no means shared by most market participants.[15] Even as these investors questioned Lehman's viability, other investors—through their statements *and* actions—indicated that Lehman was a viable investment. While one can agree today that Mr. Einhorn's concerns about Lehman's viability were not unfounded, it is only with the benefit of hindsight that one can make this assessment.[16]

## III. Background

20. Lehman was a global financial services company that provided services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management, and private equity.[17] Lehman was founded in 1850 and was headquartered in New York with regional headquarters in London and Tokyo.[18] As of May 31, 2008, Lehman had $639 billion in assets

---

General Electric Capital Corp. and Ford Motor Credit Company LLC, respectively, in order to account for the nonfinancial business component of these firms. Finally, as a robustness check, I estimate results without making the additional adjustments (that is, I perform the analysis on the companies initially identified by Capital IQ using the four selection criteria specified above). This alternative analysis did not yield meaningfully different results.

[15] See, for example, Giannone, J.A., "Greenlight Sees More Lehman Write-Downs," Reuters, December 10, 2007; "Top Value Investors to Address 2008 Value Investing Congress West in Los Angeles This May," Business Wire, March 23, 2008; and Wilchins, D., "Lehman Should Raise More Capital: Einhorn," Reuters, May 22, 2008.

[16] Furthermore, Mr. Einhorn was short-selling Lehman stock at least since early 2008. See, for example, Trincal, E., "Greenlight's Einhorn Shorting Lehman," *HedgeWorld News*, May 22, 2008; "Top Value Investors to Address 2008 Value Investing Congress West in Los Angeles This May," *Business Wire*, March 23, 2008.

[17] Lehman Brothers Holdings Inc., Form 10-K for the fiscal year ended November 30, 2007, p. 3.

[18] Lehman Brothers Holdings Inc., Form 10-K for the fiscal year ended November 30, 2007, p. 3.